**Electronically Filed
Supreme Court
SCAP-13-0000091
25-NOV-2014
09:52 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

DW AINA LE'A DEVELOPMENT, LLC,
Respondent/Co-Petitioner-Appellant-Appellee,

vs.

BRIDGE AINA LE'A, LLC.,
Respondent/Co-Petitioner-Appellant-Appellee,

and

STATE OF HAWAI'I LAND USE COMMISSION,
Petitioner/Appellee-Appellant,

and

STATE OF HAWAI'I OFFICE OF PLANNING,
COUNTY OF HAWAII PLANNING AGENCY,
Respondents/Appellees,
(CIV. NO. 11-1-112K)

------------------------------------------------------------------

BRIDGE AINA LE'A, LLC.,
Respondent/Appellant-Appellee,

vs.

STATE OF HAWAI'I LAND USE COMMISSION,
Respondent/Appellee-Appellant,

and

STATE OF HAWAIʻI OFFICE OF PLANNING and COUNTY OF HAWAIʻI,
Respondents/Appellees,

and

DW AINA LEʻA DEVELOPMENT, LLC.,
Respondent/Appellee-Appellant.
(CIV. NO. 11-1-0969-05)

SCAP-13-0000091

APPEAL FROM THE CIRCUIT COURT OF THE THIRD CIRCUIT
(CAAP-13-0000091; CIV. NOS. 11-1-112K and 11-1-0969-05)

NOVEMBER 25, 2014

RECKTENWALD, C.J., NAKAYAMA, MCKENNA, AND POLLACK, JJ.,
AND CIRCUIT JUDGE LEE, IN PLACE OF ACOBA, J., RECUSED

OPINION OF THE COURT BY RECKTENWALD, C.J.

This appeal turns on whether the Land Use Commission (the LUC) properly reverted land to its former land use classification pursuant to Hawaiʻi Revised Statutes § 205-4(g) (2001 & Supp. 2007). We hold that the LUC erred in reverting the land without complying with the requirements of HRS § 205-4 because the land owners had substantially commenced use of the land in accordance with the representations they had made to the Commission.

The instant dispute concerns the classification of land in Waikoloa on Hawaiʻi Island. In 1989, the land was reclassified from agricultural to urban, in order to allow for the development of a residential community. The reclassification

-2-

was made subject to numerous conditions, including a condition that at least sixty percent of the residential units be affordable.  Over time, the land changed hands several times and the LUC granted requests to amend the affordable housing condition.

By 2005, the condition required the landowner, Bridge Aina Leʻa, LLC (Bridge), to construct no fewer than 385 affordable units, i.e., twenty percent of the total units to be constructed.  It further required Bridge to provide certificates of occupancy for all of these units within five years, and submit a joint venture agreement and mass grading contract within a year.

In December 2008, the LUC issued an order to show cause (OSC) why the land should not revert to its former agricultural land use classification.  The LUC stated that it had reason to believe that Bridge and its predecessors in interest had "failed to perform according to the conditions imposed and to the representations and commitments made to [the LUC] in obtaining reclassification of the Subject Area and in obtaining amendments to conditions of reclassification."  Soon thereafter, Bridge informed the LUC that it intended to assign its interest in the land to DW Aina Leʻa Development, LLC (DW) through an installment sale.  DW subsequently invested more than $20 million in developing the site.  Nevertheless, after proceedings over the

course of several years, the LUC issued an order reverting the land to the agricultural use district.  Bridge and DW each sought judicial review of the LUC's decision and order, and their cases were consolidated in the circuit court.

The circuit court reversed and vacated the LUC's decision and order.  The circuit court concluded that the LUC: (1) exceeded its statutory authority and violated HRS chapter 205; (2) violated HRS §§ 205-4(h), 205-17, and 205-4(g); (3) violated HRS chapters 91 and 205 and Hawaiʻi Administrative Rules (HAR) chapter 15; and (4) violated Bridge's and DW's due process and equal protection rights.

On appeal, the LUC raises three arguments.  First, the LUC argues that HRS § 205-4(g) expressly authorizes it to issue an OSC why reclassified land should not revert to its former land use classification.  Second, the LUC argues that the circuit court erred in denying its motion to strike certain documents from other LUC cases, which had been included in the record on appeal.  Third, the LUC argues that the circuit court erred in considering Bridge's and DW's constitutional arguments, and that those arguments were unfounded.

We hold that the LUC erred in reverting the property without complying with the requirements of HRS § 205-4 that are generally applicable when land use boundaries are changed.  See infra at 64-65.  Once the LUC issues an OSC, the procedures it

-4-

must follow before reverting land depend upon whether the petitioner has substantially commenced use of the land.  Once use of the land has substantially commenced, the LUC is bound by the requirements of HRS § 205-4.  Here, by the time the LUC reverted the property to the agricultural land use district, Bridge and DW had substantially commenced use of the land in accordance with their representations.  Specifically, they had constructed sixteen townhouses on the property, commenced construction of numerous other townhouses, and graded the site for additional townhouses and roads.  At that point, more than $20 million had been spent on the project.  Although Bridge and DW had substantially commenced use of the land, the LUC failed to comply with the requirements of HRS § 205-4.  The circuit court therefore correctly concluded that the LUC erred in reverting the property.

The circuit court erred, however, in denying the LUC's motion to strike.  The disputed documents are portions of dockets from other cases in the LUC.  Because these documents were not part of the administrative record, and neither Bridge nor DW sought to supplement the record in the circuit court, these documents should not have been included in the record on appeal.

The circuit court also erred in concluding that Bridge's and DW's procedural and substantive due process rights and equal protection rights were violated.  With respect to

-5-

procedural due process, both Bridge and DW had notice of the OSC and that the LUC might revert the property. They also each had a meaningful opportunity to be heard on the proposed reversion. With regard to substantive due process, the LUC's reversion was not "clearly arbitrary and unreasonable," given the project's long history, the various representations made to the LUC, and the petitioners' failure to meet deadlines. With respect to Bridge's and DW's equal protection arguments, the record does not establish that the LUC's imposition of a condition and subsequent reversion of the property constituted a violation of the petitioners' equal protection rights.

We therefore affirm the circuit court's second amended judgment in part because the LUC failed to comply with the requirements of HRS § 205-4. We vacate the second amended judgment to the extent it is based on the circuit court's conclusion that the LUC violated Bridge's and DW's constitutional rights.

## I.  Background

The following factual background is taken from the record on appeal.

## A.  Land Use Commission proceedings

This appeal arises out of a dispute over the classification of approximately 1,060 acres of land in Waikoloa. In 1989, the LUC granted a petition to reclassify the land from

the agricultural to the urban land use district to allow for the development of a residential community. The original proposal, submitted by Signal Puako Corporation (Signal), included approximately 2,760 residential units. Signal offered to provide thirty percent of the units at prices which families with an income range of 80-120% of the County of Hawaii's median income could afford.

On January 17, 1989, the LUC reclassified the land subject to eleven conditions, including the following relevant condition related to the affordable housing units:

> 1. Petitioner shall provide housing opportunities for low, low-moderate, and moderate income Hawaii residents by offering for sale at least thirty percent (30%) of the units at prices which families with an income range up to one hundred twenty percent (120%) of the County of Hawaii's median income can afford, and thirty percent (30%) of the units at prices which families with an income range of one hundred twenty to one hundred forty percent (120-140%) of the County of Hawaii's median income can afford.
>
> This condition may be fulfilled through projects under such terms as may be mutually agreeable between the Petitioner and the Housing Finance and Development Corporation of the State of Hawaii. This condition may also be fulfilled, with the approval of the Housing Finance and Development Corporation, through construction of rental units to be made available at rents which families in the specified income ranges can afford.
>
> This affordable housing requirement shall be implemented concurrently with the completion of the market units for the residential project. The determination of median income, as that term is used in this condition, shall be based on median income figures that exist at the time that this condition must be implemented.

In 1991, Puako Hawaii Properties (PHP), Signal's successor-in-interest, filed a motion to amend the LUC's findings of fact, conclusions of law, and decision and order. PHP's

revised proposal included two "world class championship golf courses," and 1,550 residential units, including multi-family units and single-family lots. PHP offered to construct affordable units off-site, in a number equal to sixty percent of the unit count on the property.

On July 9, 1991, the LUC issued amended findings of fact, conclusions of law, and decision and order, which included the following fifteen conditions:

> 1. Petitioner shall provide housing opportunities for low, low-moderate, and moderate income Hawaii residents by offering for sale at least thirty percent (30%) of the units at prices which families with an income range up to one hundred twenty (120%) of the County of Hawaii's median income can afford, and thirty percent (30%) of the units at prices which families with an income range of one hundred twenty to one hundred forty percent (120-140%) of the County of Hawaii's median income can afford, provided, however, in no event shall the gross number of affordable units be less than 1,000 units.
>
> This condition may be fulfilled through projects under such terms as may be mutually agreeable between the Petitioner and the Housing Finance and Development Corporation of the State of Hawaii. This condition may also be fulfilled, with the approval of the Housing Finance and Development Corporation, through construction of rental units to be made available at rents which families in the specified income ranges can afford.
>
> This affordable housing requirement shall be implemented concurrently with the completion of the market units for the residential project. The determination of median income, as that term is used in this condition, shall be based on median income figures that exist at the time that this condition must be implemented.
>
> 2. Petitioner shall develop, at its expense and in coordination with the State Department of Land and Natural Resources and the County of Hawaii Department of Water Supply, the necessary water source, storage, and transmission facilities to provide an adequate supply of potable water to the Property. Petitioner shall develop the necessary water source prior to development of the Property.
>
> 3. Petitioner shall ensure that a buffer area along the boundary of the Property fronting the Queen Kaahumanu Highway right-of-way will be preserved to protect natural

open space and scenic views.  This buffer area shall be preserved in perpetuity either through the establishment of a conservation easement pursuant to Chapter 198, HRS, as amended, or such other means as shall be reviewed and approved by the Office of State Planning of the State of Hawaii.

The buffer area shall be comprised of approximately two hundred twenty-five (225) acres and shall extend inland from the Queen Kaahumanu Highway right-of-way to a depth of approximately one thousand two hundred (1,200) feet.  The depth of the buffer area may meander to a lesser or greater depth to accommodate the Project's development plan and preservation of natural open space and scenic views.  Exceptions shall be made for infrastructure improvements or corridors that may be necessary to service the developed portions of the Property.  The approximate boundaries of the natural open space buffer area are reflected in Petitioner's Exhibit 11 which is attached hereto and incorporated herein as Exhibit B.

4.  Petitioner shall participate in the funding and construction of present and future transportation improvements at project access points as identified and deemed necessary by the State Department of Transportation.  Such improvements may include a highway overpass or underpass.  Petitioner shall also participate in the funding and construction of other on-site and off-site transportation improvements necessitated by proposed development and in designs and schedules accepted by and coordinated with the State Department of Transportation, provided that the extent of Petitioner's participation shall not exceed its share of the increased community traffic impacts in the region and, provided further that, in the event the County adopts an impact fee for transportation improvements, the foregoing requirements shall not include or double-count the cost of any specific traffic improvements which may also be included in the County's impact fee computation.

5.  Petitioner shall design, locate and construct a sewage treatment plant as may be required by the County of Hawaii and the State Department of Health as to minimize adverse impacts on adjoining properties.

6.  Petitioner shall immediately stop work on the impacted area and contact the State Historic Preservation Office should any archaeological resources, such as artifacts, shell, bone, or charcoal deposits, human burial, rock or coral alignments, paving or walls be encountered during the Project's development.

7.  Petitioner shall provide a maximum of sixteen (16) acres within the Property for public school site(s), as the State Department of Education may determine to be necessary to service the Property, at no cost to the State of Hawaii.  These school site(s) shall be provided, if there is a need for such site(s), in location(s) designated for community

facilities on Petitioner's master plan, or in location(s) as may be mutually agreeable to the Petitioner and the State Department of Education.

8. Prior to the development or transfer of any interests whatsoever in and to the Project, Petitioner shall provide community benefit assessments as agreed between Petitioner and the Office of State Planning and shall file it with the Commission within 30 days of the execution of the agreement.

9. Petitioner shall comply with "The Eight (8) Conditions Applicable to This Gold Course Development", prepared by the State Department of Health dated April, 1990 (Version 3) and attached hereto.

10. Petitioner shall engage the services of a qualified golf course manager to oversee the irrigation of the golf course and application of fertilizers and pesticides to the golf course and who shall be certified by the State Department of Agriculture in the application of fertilizers and pesticides.

11. Petitioner shall make available adequate golf tee times, no less than forty (40) percent of total daily golf tee times, at affordable rates for public play by Hawaii State residents.

12. Petitioner shall provide annual reports to the Land Use Commission, The Office of State Planning and the County of Hawaii Planning Department in connection with the status of the Project and Petitioner's progress in complying with the conditions imposed.

13. Petitioner shall develop the Property in substantial compliance with the representations made to the Commission. Failure to so develop the Property may result in reversion of the Property to its former classification, or change to a more appropriate classification.

14. Petitioner shall give notice to the Land Use Commission of any intent to sell, lease, assign, place in trust, or otherwise voluntarily alter the ownership interest in the Property covered in the petition, prior to development of the Property.

15. The Commission may fully or partially release these conditions as to all or any portion of the Property upon timely, and upon the provision of adequate assurance of satisfaction of these conditions by the Petitioner.

In 2005, Bridge (who had acquired the land at issue in 1999) filed a motion with the LUC to amend the 1991 decision and order, including the affordable housing condition. Specifically,

Bridge sought to have the affordable housing condition (condition #1) amended to read as follows:

> Petitioner shall provide affordable housing opportunities for low, low moderate and moderate income residents of the State of Hawaii, which shall be consistent and coincide with County of Hawaii affordable housing requirements. The location and distribution of the affordable housing or other provision for affordable housing shall be under such terms as may be mutually agreeable between the Petitioner and the County of Hawaii.

Bridge explained that the scope of the project had changed significantly from the time of the original order, and that Bridge was proposing to build 1,924 residential units, 384 of which would be for affordable housing. Bridge further explained that the then-existing sixty percent affordable unit requirement was "not economically feasible because the cost of compliance effectively prevent[ed] the Petitioners from going forward with the development of the Project." Bridge also explained that the proposed 384 affordable housing units were in line with the County of Hawaii's twenty-percent affordable housing requirement.

On November 25, 2005, the LUC granted Bridge's motion to amend the affordable housing condition. The LUC amended that condition to provide the following:

> 1. Petitioner shall provide housing opportunities for low, low-moderate, and moderate income residents of the State of Hawaiʻi by offering for sale at least twenty percent (20%) of the Project's residential unit prices determined to be affordable by the County of Hawaiʻi Office of Housing and Community Development, provided, however, in no event shall the gross number of affordable housing units within the Petition Area be less than 385 units. The affordable housing units shall meet or exceed all applicable County of Hawaiʻi affordable housing standards, and shall be completed

-11-

> in substantial compliance with the representations made to the Commission.
>
> 1b.  Petitioner shall obtain, and provide copies to the Commission, the certificates of occupancy for all of the Project's affordable housing units within five (5) years of November 17, 2005.
>
> 1c.  Petitioner shall submit to the Commission the Petitioner's signed joint venture agreement and a mass grading contract within a reasonable amount of time, not to exceed one (1) year from November 17, 2005.

During 2006 and 2007, Bridge periodically appeared before the LUC to provide updates on the project.  On October 11, 2007, the County Planning Department informed Bridge that an Environmental Impact Statement (EIS) was required for the project, pursuant to this court's decision in Sierra Club v. Department of Transportation, 115 Hawaiʻi 299, 167 P.3d 292 (2007).

During a meeting held by the LUC on September 18, 2008, commissioners expressed concern that annual progress reports submitted by Bridge in 2005, 2006, and 2007 showed "no activity" with respect to the conditions imposed by the 1991 decision and order, as amended in 2005.  Specifically, Commissioner Lisa M. Judge stated:

> I mean it's clear they have not, I believe, or we have reason to believe, that they're failing to perform on the condition that was imposed, specifically this affordable housing condition.
>
> I would say that the Commission should issue an Order to Show Cause to say why the property classification -- that the property should not revert to its former land use classification.
>
> I would set forth a motion that the Commission issue an Order to Show Cause why the petition area should not revert to its former classification or more appropriate

-12-

classification.

The LUC voted 6-0 to issue an OSC.

On October 2, 2008, Bridge submitted to the LUC its annual progress report for 2008.  In the report, Bridge stated that it "was proceeding with its efforts to develop and complete the affordable housing units," but that "progress has been set back by the determination by the [Planning Director of the County of Hawaiʻi] that an accepted EIS will be required before the Planning Department accepts the Project District Application for review and processing and by the denial of the [Nonsignificant Zoning Change Application], presently on appeal with the Board of Appeals."

On December 9, 2008, the LUC issued an OSC, pursuant to HRS § 205-4(g),[1] and HAR § 15-15-93 (2000),[2]

_____

[1]      HRS § 205-4(g) provides:

Within a period of not more than three hundred sixty-five days after the proper filing of a petition, unless otherwise ordered by a court, or unless a time extension, which shall not exceed ninety days, is established by a two-thirds vote of the members of the commission, the commission, by filing findings of fact and conclusions of law, shall act to approve the petition, deny the petition, or to modify the petition by imposing conditions necessary to uphold the intent and spirit of this chapter or the policies and criteria established pursuant to section 205-17 or to assure substantial compliance with representations made by the petitioner in seeking a boundary change. The commission may provide by condition that absent substantial commencement of use of the land in accordance with such representations, the commission shall issue and serve upon the party bound by the condition an order to show cause why the property should not revert to its former land use classification or be changed to a more appropriate classification.  Such conditions, if any, shall run with the land and be recorded in the bureau of conveyances.

(continued...)

[1](...continued)

(Emphasis added).

[2]    HAR § 15-15-93 provided:

(a) Any party or interested person may file a motion with the commission requesting an issuance of an order to show cause upon a showing that there has been a failure to perform a condition, representation, or commitment on the part of the petitioner.  The party or person shall also serve a copy of the motion for an order to show cause upon any person bound by the condition, representation, or commitment.  The motion for order to show cause shall state:

>    (1) The interest of the movant;
>
>    (2) The reasons for filing the motion;
>
>    (3) A description and a map of the property affected by the condition;
>
>    (4) The condition ordered by the commission which has not been performed or satisfied;
>
>    (5) Concisely and with particularity the facts, supported by an affidavit, giving rise to a belief that a condition ordered by the commission has not been performed or satisfied; and
>
>    (6) The specific relief requested.

(b) Whenever the commission shall have reason to believe that there has been a failure to perform according to the conditions imposed, or the representations or commitments made by the petitioner, the commission shall issue and serve upon the party or person bound by the conditions, representations, or commitments, an order to show cause why the property should not revert to its former land use classification or be changed to a more appropriate classification.  The commission shall serve the order to show cause in writing by registered or certified mail with return receipt requested at least thirty days before the hearing.  A copy shall be also sent to all parties in the boundary amendment proceedings.  The order to show cause shall include:

>    (1) A statement of the date, time, place, and nature of the hearing;
>
>    (2) A description and a map of the property to be affected;
>
>    (3) A statement of the legal authority under

(continued...)

-14-

why the land "should not revert to its former land use classification or be changed to a more appropriate classification." The LUC stated that it had reason to believe that Bridge and its predecessors in interest had "failed to perform according to the conditions imposed and to the representations and commitments made to [the LUC] in obtaining reclassification of the Subject Area and in obtaining amendments to conditions of reclassification." Specifically, the LUC noted the following:

> 1. Condition 1a and 1b of the Findings of Fact, Conclusions of Law and Decision and Order, dated July 9, 1991, as amended on November 25, 2005 ("Decision & Order") requires Petitioner, by November 17, 2010, to provide no fewer than 385 affordable housing units within the Petition Area that meet or exceed all applicable County of Hawaii affordable housing standards and substantially comply with

---

[2](...continued)
which the hearing is to be held;

(4) The specific sections of the statutes, or rules, or both, involved; and

(5) A statement that any party may retain counsel if the party so desires.

(c) The commission shall conduct a hearing on an order to show cause in accordance with the requirements of subchapter 7, where applicable. Any procedure in an order to show cause hearing may be modified or waived by stipulation of the parties and informal disposition may be made in any case by stipulation, agreed settlement, consent order, or default.

(d) Post hearing procedures shall conform to subchapter 7 or subchapter 9. Decisions and orders shall be issued in accordance with subchapter 7 or subchapter 9.

(e) The commission shall amend its decision and order to incorporate the order to show cause by including the reversion of the property to its former land use classification or to a more appropriate classification.

(Emphasis added).

representations made to the Commission.

2. Condition 1c of the Decision & Order requires Petitioner to submit to the Commission by November 17, 2006: 1) the Project's signed joint venture agreement, and 2) a mass grading contract.

3. Petitioner has represented that the infrastructure and concrete pad for the affordable housing portion of the Project will be the first part of the Project to be constructed, thereby enabling the market units and the affordable housing units to be constructed concurrently.

4. Petitioner has committed to building the Project's affordable units instead of paying an in-lieu fee to the County of Hawaii.

5. Petitioner represented that all contracts with the general contractor, subcontractors and other construction related consultants have been fully negotiated and will be executed within 30 days following the Commission's decision [in November 2005].

6. Petitioner has represented that no additional discretionary governmental approvals remain outstanding, with the sole exception of the highway access approval by the State Department of Transportation.

(Brackets in original).

The LUC held a hearing on the OSC on January 9, 2009.[3] During the hearing, several Commissioners expressed concern over the project's lack of progress. For example, Commissioner Judge stated the following:

And in 2005 the Petitioner promised to provide 385 affordable housing units to the Kona community within three years. They promised that the development would provide jobs and the very much needed workforce housing for West Hawaiʻi.

. . . .

Unfortunately, here we are today and there are no affordable homes on that development. Worse yet, there's

_____

[3] In the meantime, Bridge had filed another motion to amend the affordable housing condition. In this motion, Bridge requested that the affordable housing condition be amended to require Bridge to provide up to one hundred workforce housing units within three years of the filing of the amended condition. Bridge subsequently withdrew this motion.

not even a glimmer of them coming any time soon. There's no building permits, there's no infrastructure.

But the real cause or the real reason that we are here today I think is much bigger. It's a much larger issue. Because in my mind the hearing for the Order to Show Cause is when I looked back this petition started back in November 25th, 1987, more than 20 years ago when the first Petitioner, Signal Puako Corporation, filed their district boundary [] amendment petition.

. . . .

So the affordable housing condition in my mind is really just the straw that broke the camel's back. The real[] reason I made the Motion for the Order to Show Cause is there's a state statu[t]e, [HRS § 205-4(g)] that states that, "The Commission may provide by condition that absent substantial commencement of use of the land in accordance with such representations the Commission shall issue and serve upon the party bound by the condition an Order to Show Cause why the property should not revert to its former land use classification or be changed to a more appropriate classification."

So in my mind there's been 20 years that have gone by and nothing has happened. There were representations made to the community. There are several conditions attached to those decision and orders.

. . . .

So in my mind it's not only the affordable housing condition that needs to be amended. In my mind it's every condition needs to be revisited, discussed and amended. Then a decision can be made.

The LUC ultimately continued the hearing. In closing, the LUC chairman stated the following:

During this period the Petitioner is urged to prepare and present an updated description of its projects with timetables and critical paths, and to review the existing LUC conditions and commitments, and to determine whether a further motion is necessary in order to obtain relief from conditions that cannot be met, and, if necessary, to request changes to conditions necessary to harmonize the Project with the LUC conditions.

In February 2009, Bridge informed the LUC that it intended to assign "all of its right, title, and interest" in the land to DW through an installment sale. DW, in turn, filed a

-17-

petition to be a co-petitioner with Bridge or, alternatively, to be given party status or to intervene.

The LUC resumed the hearing on the OSC on April 30, 2009. For purposes of the hearing, Bridge was treated as the sole petitioner. DW did not participate in the hearing because the LUC had not yet ruled on DW's request to be a co-petitioner. During the hearing, the County Planning Department argued that "the current Urban District designation is appropriate and that the public interest would be best served by allowing [Bridge] to maintain its current classification." The State Office of Planning argued, however, that "reversion of the property to its original classification of Agriculture would be appropriate under the facts and circumstances of this case." Specifically, the State Office of Planning argued the following:

> The issue today is whether the Petitioner has complied with their representations in developing the property and whether they are able to build [385] affordable units on site and obtain Certificates of Occupancy by November 2010.
>
> In our view they have not developed in accordance with their representations. . . .
>
> Our only comments would be that in our view the change in ownership is irrelevant to the initial and only question which is whether they will be able to comply with the condition.
>
> We would not support any change, any amendment, any extension. This matter has gone on for many years. You may remember that the affordable housing requirement was amended to reduce those requirements in 2005. That amendment, that reduction in the requirements was based upon a variety of representations.
>
> In order to preserve the integrity of this process we cannot allow developers to come back before you repeatedly each time they cannot comply with those representations, each time they cannot comply with a condition and simply ask

-18-

that a condition be changed or removed.

At the end of the hearing, the LUC voted 7-0 to revert the land to agricultural use. DW then moved to stay entry of decision and order on the LUC's April 30 action, pending consideration of additional evidence. In its motion, DW argued that its evidence included "facts that were not available to the Land Use Commission at the April 30, 2009 meeting and include[d] certain key facts which [would] allow the development to proceed and which [would] allow fulfillment of the affordable housing condition applicable to this docket."

On June 5, 2009, the LUC took under advisement DW's request to be a co-petitioner, granted DW's motion to stay entry of a decision and order on the OSC, and decided to schedule a one-day hearing for the submission of additional evidence on the OSC. Bridge filed a motion to rescind the OSC, arguing that it had made "substantial commencement of use of the land."

The LUC held the one-day evidentiary hearing on August 27, 2009. Bridge designated DW as its agent for purposes of presenting evidence on the progress of the project and compliance with the decision and order of the LUC. During the hearing, DW's president, Robert Wessels, testified that DW and Bridge were prepared to close on the sale of approximately 61 acres of the 1,060 acre parcel for the development of the affordable housing units. Wessels explained that grading of this

site had begun, and that a second access road to the site had been prepared so that infrastructure work and construction of the townhouses could occur simultaneously.  Wessels explained that a "package" sewage treatment plant would be used for the affordable housing units.

During cross-examination by the State Office of Planning, the following exchange occurred:

> Q:  Mr. Wessels, you are familiar with the requirements for a certificate of occupancy?
>
> A:  Yes, I am.
>
> Q:  In order to get a certificate of occupancy do you know whether or not you need to have a working electrical hookup?
>
> A:  I believe you do, yes.  You have to meet the life safety standards.  And electrical would be one of the requirements.
>
> Q:  You would also need to have sewage hookup, correct?
>
> A:  That's correct.
>
> Q:  You would also need to have the water hookup, correct?
>
> A:  Yes.
>
> Q:  And you would need to have access to the road such as Queen Kaʻahumanu Highway, correct?
>
> A:  That's correct.
>
> Q:  You would need all of that before a certificate of occupancy could be issued, correct?
>
> A:  That's correct.

And later, the following exchange occurred:

> Q:  Your current construction plan would have the vertical construction [i.e., townhouse construction] going on while horizontal construction [i.e., infrastructure construction] is continuing, is that right?
>
> A:  That's correct.

Q:      Would the vertical construction begin before the
        infrastructure connections to that pad or that pod is
        completed?

A:      Yes.  It has to in order to meet the schedule.

Q:      So you build the house before you have a connection to
        the sewer, water, and electrical lines.

A:      That's correct.

In response to questions from the commissioners, Wessel testified that DW had already spent approximately $4.5 million on the project.  The following exchange also occurred:

COMMISSIONER WONG:      Another question.  On the affordable
                        housing, once you start vertical
                        construction how many homes would
                        you be able to build say, per month?

A:                      We are starting 32 houses a month,
                        basically.  And as we build to begin
                        with, we build so we will be
                        delivering and finishing roughly 30-
                        40 houses a month, roughly one[-
                        ]and-a-half a day.

COMMISSIONER WONG:      So let us say by March 31st how many
                        homes would you be able to finish,
                        31st of next year?

A:                      (off mic) By the 31st of March
                        according to our schedule we had
                        roughly 32 units.

CHAIRMAN PLITZ:         Could you repeat that with the
                        mic[?]

A:                      Yes.  According to our construction
                        schedule as lined out we will have
                        one pad completed by the 31st of
                        March, which is 32 town homes.

By a 6-3 vote, the LUC rescinded and vacated the OSC "provided that as a condition precedent, [Bridge] completes 16 affordable units by March 31, 2010.  Further, that the County of Hawaiʻi shall provide quarterly reports to the [LUC] in connection with the status of [Bridge's] progress in complying

-21-

with this condition." The LUC also voted 8-1 to accept DW as a co-petitioner. The LUC issued a written order rescinding the OSC and accepting DW as co-petitioner.

On December 16, 2009, the LUC received DW's annual report. The report detailed how DW was progressing on satisfying each of the conditions. With respect to the affordable housing condition, the report provided the following:

> DW Aina Le'a Development, LLC ("DW") is working to satisfy condition 1. As previously reported to the Commission in the Commission's hearing in the docket earlier this year, DW subdivided a portion of the Petition area (Parcel D-1-B) in which the initial affordable housing units will be built as part of Phase 1. Phase 1 involves the construction of fifty four (54) 8 unit multiple family structures. Two structures will be located on each of 27 pads. The individual units which will be provided to meet the affordable housing requirements will be either three bedroom units or four bedroom units. DW has previously submitted to the Commission its financing commitments for Phase 1.

> Not less than 385 of these units will conform to the affordable housing requirements in the affordable housing agreement with the County Office of Housing Agency. The actual number of affordable housing units may be increased to conform to County of Hawaii affordable housing requirements.

> The Phase 1 scheduling is designed to produce certificates of occupancy for the 385 Phase 1 affordable housing units by November 17, 2010.

> DW has entered into a joint development agreement with Bridge Aina Le'a LLC which provides the development with rights to access over the agriculturally classified land, rights to obtain water for the Project and to establish a school site acceptable to the State Department of Education on Bridge Aina Le'a's agriculturally classified land.

> DW has a mass grading and design build contract with Goodfellow Brothers which has been previously submitted to the Commission. The grading plans for Phase 1 were approved by the County Department of Public Works and appropriate grading permits were issued. Mass grading has been ongoing to create the building sites and the access roads. Although the grading plan review and approval process took longer than DW initially anticipated, mass grading design drawings for the affordable units are 90% complete and all required

-22-

permits have been obtained to allow grading to proceed. Schedule adjustments are being made to allow the Project to retain its schedule.

The following has been completed:

a.  About 90% of the mass grading for the affordable housing townhouse sites has been completed;
b.  Finish grading for 18 affordable housing foundation pads is complete (foundation slabs are scheduled to begin in mid-December 2009);
c.  The immediate access roadway has been graded;
d.  About 80% of the internal roadways have been graded;
e.  The initial engineering for the roads and utilities has been completed;
f.  The water supply tank sites and service corridors have been identified;
g.  Improvements have been made to the existing water well and a 750,000 gallon collection reservoir for dust control during construction has been built;
h.  The necessary utility easements have been identified and topographic maps have been completed (Installation of site utilities to begin about 1/1/2010);
i.  Plan Approval by the Planning Department for the affordable housing component was issued on November 30, 2009;
j.  Groundbreaking for the affordable housing phase was held on September 22, 2009;

All necessary permits, including vertical construction permits for the affordable housing site have been prepared and were recently submitted.  DW is working with the County to [ensure] that the applications for permits will be processed to meet the development schedule.

DW is working with the Office of Housing and Community Development on the terms of the affordable housing agreement.  The affordable housing units will be in buildings which have 16 units in each pad area.  The 25 pad areas will accordingly produce 400 units of which at least 385 will be affordable housing units.  For the affordable housing units, the mix will be 289 three bedroom units and 96 four bedroom units.  A revised affordable housing agreement was presented to the Office of Housing for its review and approval.  The affordable housing units will be fee simple condominium units.  DW is processing [sic] to create the condominium units so that specific affordable housing units can be identified for the affordable housing agreement.

On May 4, 2010, the State Office of Planning submitted a letter to the LUC commenting on DW's progress.  With respect to

the condition precedent that sixteen units be completed by March 31, 2010, the letter noted that "any vertical construction which occurred was not accompanied by any utility connections, and the units cannot be occupied. The Commission has not addressed whether a unit which has no electricity, water, sewage connection or roadway infrastructure can be deemed 'complete.'" The State Office of Planning further noted that DW was behind schedule in seeking approval of the EIS, and that the EIS needed to be approved before DW could secure approval for required road improvements and installation of the wastewater treatment plant.

The State Office of Planning also stated that Capital Asia Group, one of the investors in the project, was using a "troubling advertisement" guaranteeing a thirty percent return on investment over the course of thirty months. The State Office of Planning explained that the advertisement was troubling because "it indicates that financing is likely not secure."

The LUC visited the construction site on May 6, 2010. The following month, the LUC mailed a letter to DW, requesting a written status report in preparation for a hearing scheduled for July 1, 2010. The LUC requested that DW comment on the status of its compliance with the condition precedent that sixteen units be completed by March 31, 2010, and to address the concerns raised by the State Office of Planning in its May 4, 2010 letter. The LUC also asked DW to provide an update on its compliance with

each of the conditions under the 1991 decision and order, as amended in 2005.

The LUC received DW's status report on June 14, 2010. In its report, DW stated the following:

> DW understood the requirement to be that it needed to complete construction of at least 16 of the affordable housing units by March 31, 2010. Since these units are in 8 unit buildings, this required the completion of construction of two buildings.
>
> DW completed the first two buildings with 8 affordable housing units each by March 31, 2010. These buildings have completed exteriors and interiors. The electrical and plumbing for the units in these buildings is completed and ready to hook up. The units have cabinets and appliances installed.
>
> . . . .
>
> The condition precedent did not require that DW obtain certificates of occupancy for the 16 affordable units by March 31, 2010. The presentation to the Commission and the proceedings on August 27, 2009 show that it was understood construction work would be proceeding even if the certificates of occupancy could not be obtained until a later time.
>
> DW had submitted to the Commission its schedules for construction of the . . . 385 affordable housing units required by Condition 1 of the Decision and Order filed on November 25, 2005. Those schedules described the site work needed to create access to building sites, the establishment of the building pads for the structures for the affordable housing units and the vertical construction of the structures.
>
> . . . .
>
> I had submitted a July 30, 2009 status report in response to your July 10, 2009 letter for a status report on how Petitioners would comply with conditions for reclassification. The July 30, 2009 status report included a Phase 1 schedule for vertical construction of Phase 1[.] In the status report, I had indicated "[t]he goal for Phase 1 is to obtain occupancy permits for the affordable housing units by November 17, 2010[.]"
>
> The condition was imposed after the Commissioners had expressed concerns over the lack of action to implement representations made by prior owners in the past. The imposition of the condition precedent was a means of holding DW to actually constructing affordable housing improvements.

-25-

> Given the testimony that was submitted before the Commission imposed its condition precedent, the record showed that a number of facts, including the completion of this EIS process and the approval of Queen Kaahumanu Highway intersection and wastewater treatment plans would be needed . . . before occupancy permits could be obtained.
>
> DW's plans as presented to the Commission were to start with construction of the affordable housing units as soon as appropriate grading and building permits were obtained and not to wait for the EIS, intersection plan or wastewater treatment plant approvals.
>
> DW believes that it has complied with the condition precedent and has demonstrated by actions its commitment to proceed with this project.  As noted below, DW has not limited its construction efforts to these two buildings. The site grading for all of the Phase 1 building is completed. . . . DW has also had 5 more buildings erected which are under construction. . . . Other efforts by DW to further work on this project are also described below.
>
> To date, DW and its contractors have spent more than $19,000,000 in proceedings with this project.

During the July 1, 2010 hearing, Commissioners expressed concern that DW had not yet secured title to the remaining 1,000 acres of land, the lack of communication with the LUC, and the availability of financing for the project.  The State Office of Planning also stated that it was concerned because the condition precedent was not satisfied, the EIS was behind schedule, the pace of construction had slowed, the representations made by Capital Asia were problematic, the failure to provide the LUC with notice of changes in ownership, Bridge's continuing interest in the project, and November 17, 2010 should be considered a deadline, not a goal.

At the end of the hearing, Commissioner Devens moved to keep the OSC pending, to schedule a hearing on or after September 17, 2010 to consider the OSC, to affirm that

November 17, 2010 was a deadline, and that the condition precedent had not been satisfied.  The motion passed by a vote of 8-0.  The LUC also issued a written order finding that DW had failed to meet the condition precedent for rescinding the OSC.

On August 31, 2010, DW filed a motion to amend conditions 1, 5, and 7.  Specifically, DW moved to amend the affordable housing condition to allow it to complete "the minimum 385 affordable housing units on the following schedule: 190 units by December 31, 2011, 195 units by December 31, 2012"; to modify condition 5 "to allow the waste water treatment plant which will service the entire project to be located outside the urban classified area"; and to amend condition 7 "to require either that [DW] provide to the State Department of Education ("DOE") 16 acres of land within the urban classified area for a public school or provide to DOE 32 acres of land outside the urban classified area at such location and upon such terms as are acceptable to DW and to the DOE."  The County Planning Department took no position on DW's motion, the State Office of Planning opposed the motion, and Bridge concurred in the motion, but argued that the LUC should "eliminate any artificial, arbitrary 'deadlines,' and instead base [the affordable housing condition] upon a revised development schedule that reasonably and credibly reflects demand, absorption, and financing in the current market."  DW later submitted a supporting exhibit, i.e., a letter

from the County Planning Department indicating that it had accepted the final EIS for the project.

DW later moved to amend its motion. Specifically, DW sought to have condition 1 amended to read as follows:

a. A requirement that an updated master plan covering all 5 phases of the development be submitted to the Land Use Commission (hereinafter referred to as "LUC") for its review and approval;

b. That the phasing be adjusted to be consistent with the current requirements of the LUC. The phasing requirements would therefore be adjusted to fit within 10 year development periods. The phasing would also include requirements that infrastructure benefitting more that one phase be completed before development of later phases which would be dependent on when such infrastructure can begin;

c. That DW Aina Leʻa will continue to complete the affordable housing units in Phase I and related infrastructure as the priority of the development. DW Aina Leʻa will not proceed with the development of units after Phase I until the updated Master Plan has been reviewed and approved by the LUC and the first 56 affordable housing units have been completed and the affordable housing sales program has been started, DW Aina Leʻa will maintain its sales program for such units and will continue to build affordable housing units so as to maintain an inventory of such units for sale to qualified residents with a minimum inventory of 16 units; and

d. The current conditions of approval would be amended to be consistent with the current practices and requirements of the LUC.

On November 12, 2010, Bridge filed a motion requesting an order providing the following: (1) the LUC shall not act on the OSC scheduled on the agenda for November 18, 2010; (2) the LUC is required to strictly follow HRS Chapter 91, HRS Chapter 92, HRS Chapter 205, and Hawaiʻi Administrative Rules (HAR) Chapter 15 with respect to the OSC; (3) the OSC is null and void because the LUC did not follow the applicable statutes and rules;

and (4) the LUC is estopped from proceeding with or taking any further action on the matters set forth in the OSC. DW joined Bridge's motion.

The following week, the LUC held a hearing on the OSC. Due to "the limited number of Commissioners available," however, the LUC heard "evidence and argument on the Show Cause Order," but deferred ruling on the order.

The State Office of Planning then filed a motion for an OSC. The Office of Planning argued that Bridge and DW "clearly violated the LUC's terms and conditions," and that "[i]n order to preserve the integrity of LUC decisions and the LUC decision-making process, Petitioner must be held accountable, and must come forward to explain why the Petition Area should not be reclassified to its former more appropriate classification."

The LUC scheduled a January 20, 2011 hearing on the OSC, Bridge's November 12, 2010 motion, the State Office of Planning's motion, and Bridge's August 31, 2010 motion to amend. Following the hearing, the LUC voted 5-3 to revert the property to the agricultural land use district. The LUC also voted 8-0 to deny as moot the State Office of Planning's motion for an OSC, and Bridge's November 12, 2010 motion. The LUC did not rule on DW's motion to amend.

On February 17, 2011, DW submitted a request for a hearing on its motion to amend. On the same day, DW also

submitted a request to comment on any proposed findings of fact and conclusions of law.  The LUC scheduled a March 10, 2011 hearing on the adoption of proposed findings of fact, conclusions of law, and decision and order, and on the motion to amend.

The day before the hearing, DW moved for a continuance. During the hearing, the LUC voted 6-2 to adopt the proposed findings of fact, conclusions of law, and decision and order, with amendments.[4]  By a 6-2 vote, the LUC also granted a continuance on DW's motion to amend.

On March 17, 2011, DW filed a motion to reconsider and to defer entry of final findings of fact, conclusions of law, and decision and order.  Bridge joined DW's motion.  The State Office of Planning took no position on the motion.

Following a hearing on April 8, 2011, the LUC deferred acting on DW's motion to reconsider, and deferred acting on the proposed findings of fact, conclusions of law, and decision and order.  During a subsequent hearing, Commissioner Kanuha moved to grant in part and deny in part DW's motion to amend. Commissioner Kanuha's motion was defeated 3-5.  With respect to DW's motion to reconsider and defer entry of final findings of fact, conclusions of law, and decision and order, the LUC voted 5-3 to deny the motion.  The LUC also voted 6-2 to adopt the

_____

[4]     Bridge subsequently filed exceptions and objections to the proposed findings of fact, conclusions of law, and decision and order, and filed its own proposed findings, conclusions, and decision.  DW also filed exceptions to the proposed findings, conclusions, and decision and order.

proposed findings of fact, conclusions of law, and decision and order, with amendments.  Finally, on May 13, 2011, the LUC voted 6-0 to deny DW's motion to amend.

On April 25, 2011, the LUC entered an order adopting the proposed findings of fact, conclusions of law, and decision and order.  The LUC made the following relevant findings of fact:

G. Violations

57. As of November 17, 2010, Petitioners had failed to provide certificates of occupancy for at least 385 affordable dwelling units, and violated Condition 1 of the 2005 Order.

58. As of January 20, 2011, over 22 years since the reclassification was first granted, Petitioners had failed to obtain a certificate of occupancy for even one affordable dwelling unit within the Petition Area.

59. Of the 385 affordable dwelling units, Petitioners have approximately 40 dwelling units in various stages of vertical construction all in the same area.

60. There is no infrastructure connection to any of the affordable dwelling units, including electrical lines, sewage lines, water lines, and finished roads.  Current construction and preliminary infrastructure development has been limited to a 62-acre portion of the 1,060 acre Petition Area, including temporary access roads.

61. As of July 1, 2010, Petitioners owed approximately 5.5 million dollars to the General Contractor, Goodfellow Brothers for work previously done.

62. Petitioners continue to be in violation of Condition 1 of the 2005 Order, and are unlikely to complete 385 affordable units in the near future.

63. Petitioners have not substantially commenced use of the Petition Area in conformance with the representations made in 2005 or in conformance with the applicable representations and conditions as of January 20, 2011.  Furthermore, Petitioners have failed to substantially comply with representations made to the Commission.

64. Through multiple status hearings and the issuance of the December 9, 2008 Order to Show Cause, the Commission has clearly informed Petitioners of the importance of complying with their representations and all conditions of approval, including but not limited to Conditions 1 and 13.

-31-

65. It is important to the integrity of the State land use process that Petitioners comply with the conditions imposed by the Commission and with the representations made by the Petitioners.

66. Under the facts and circumstances of this case, Petitioners have failed to show cause why the Petition Area should not be reverted to its original classification. Petitioners have continually violated Condition 13, which requires them to substantially comply with representations made to the Commission, including but not limited to the following:

• On September 30, 2005, Mr. Paoa represented that Petitioner Bridge would build 385 affordable housing units on-site within the Petition Area (2005 Order, FOF 9); that the homes would be built and certificates of occupancy obtained within three years (2005 Order, FOF 12); that no additional discretionary governmental approvals were needed, with the sole exception of the highway access approval (2005 Order FOP 26); and that all Petitioner Bridge's contracts with contractors and consultants have been negotiated and would be executed and construction site work started within 30 days of the Commission's decision (2005 Order, FOF 24 and 25).

• On April 30, 2009, Petitioner Bridge represented the capabilities, particularly the experience and financial capability of DW 'Aina Le'a to step into Bridge's shoes and meet all the conditions the Commission had set down. Further, Mr. Paoa represented that Petitioner Bridge had the capabilities to meet the timeline for construction of the affordable housing.

• On June 5, 2009, in response to a question by the Commission prior to being accepted as a co-petitioner, a representative of DW 'Aina Le'a represented that they had reviewed the conditions imposed by the Commission and that they were prepared to comply with the conditions. The representative of DW 'Aina Le'a also represented that they had no intent to seek to amend conditions in the 2005 Order.

• On August 27, 2009, Mr. Wessels, a representative of DW 'Aina Le'a, represented that DW 'Aina Le'a was familiar with the Commission's July 10, 2009 letter to Petitioner Bridge requesting information on compliance with conditions, the subsequent response letter by Petitioner Bridge on July 30, 2009, DW 'Aina Le'a's response letter on July 31, 2009, and that DW 'Aina Le'a was prepared to comply with the conditions imposed by the Commission in their 2005 Decision and Order.

• On December 16, 2009, Co-Petitioner DW 'Aina Le'a submitted an annual report that represented that all necessary permits, including vertical construction permits for the affordable housing site had been prepared and recently submitted; that they planned to construct the wastewater treatment plant in the Agricultural District which would require a State Special Permit and amendments to the

-32-

conditions; that they intend to provide 32 acres in the Agricultural District to the Department of Education which would require amendments to the conditions; that they would comply with DOH conditions; and that they will provide the Commission with notice of any intent to sell, lease, assign, place in trust, or otherwise voluntarily alter the ownership interest of the Property.

• On November 18, 2010, Co-Petitioner DW ʻAina Leʻa admitted not meeting a deadline by a "very major amount" in reference to the requirement to provide certificates of occupancy for 385 affordable units by November 17, 2010; and further admitted that they could not provide a firm date by which the 16 units that had been constructed could be occupied.

• On November 18, 2010, in response to questioning by the Commission, Co-Petitioner DW ʻAina Leʻa represented that condominium documents had not been submitted, the package wastewater treatment plant had not been delivered and plans not submitted to the State Department of Health for review and approval, no application had been made to the Public Utilities Commission for approval of wastewater or water utilities, no plans for landscaping had been submitted for review and approval by the County, and Co-Petitioner DW Lea had not authorized anything to facilitate the construction of the intersection to provide access to the Property.

The LUC also made the following conclusions of law:

1. Any conclusions of law herein improperly designated as a finding of fact should be deemed and construed as a conclusion of law; any finding of fact herein improperly designated as a conclusion of law should be deemed and construed as a finding of fact.

2. The Commission has the authority to revert a Petition Area to its original land use classification for failure to comply with the conditions imposed by the Commission. Lanaʻi Co. Inc. v. Land Use Commission, 105 Hawaiʻi 296, 318 (Haw. 2004), and HRS Section 205-4(g).

3. Under the facts and circumstances of this case, Petitioners have failed to satisfy Condition 1 and have failed to substantially comply with representations made to the Commission, in violation of Condition 13.

4. Under the facts and circumstances of this case, reversion of the Petition Area to its original agricultural classification does not violate any applicable rule or statutory provisions, including Hawaiʻi Administrative Rules (HAR) subchapter 7 of Chapter 15-15, and HRS Chapters 91, 92, and 205.

5. The Commission does not rule upon questions of constitutional law.

6. Under the facts and circumstances of this case, reversion

-33-

> of the Petition Area to its original agricultural
> classification for violation of conditions, including
> Condition 1 and Condition 13, is not precluded by the
> doctrine of estoppel.

The LUC therefore ordered that the property be reverted to its prior agricultural land use classification.

## B.    Circuit court proceedings

Bridge appealed the LUC's order to the Circuit Court of the First Circuit (Civil No. 11-1-0969-5), and DW appealed to the Circuit Court of the Third Circuit (Civil No. 11-1-0112K).  The parties later stipulated to  transfer venue of Bridge's appeal to the Third Circuit, where the two appeals were consolidated.[5]

DW filed a motion to stay the LUC's April 25, 2011 order.  DW argued it was likely that it would prevail on the merits, it would sustain irreparable harm absent a stay, and the public interest would be served by a stay.  The circuit court denied DW's motion to stay.  The circuit court concluded that the LUC had not violated HRS § 205-4(h) because the reversion was made pursuant to HRS § 205-4(g), but that there was insufficient evidence to determine whether DW would prevail on its argument that the LUC had violated HRS § 205-4(g).  The circuit court also concluded that it could not assess the merits of DW's vested rights, estoppel, and constitutional arguments.  The circuit court further concluded that the threat of irreparable harm was

---

[5]     The parties also stipulated to dismissing without prejudice all claims against the State of Hawaiʻi Office of State Planning, County of Hawaiʻi, and County of Hawaiʻi Planning Department.

-34-

speculative, and that it could not determine whether the public interest would be served by a stay. The LUC filed a motion to strike a portion of the record on appeal. Specifically, the LUC sought an order:

> striking that portion of the Designation of Record on Appeal designating the following dockets as part of the record on appeal: Land Use Commission dockets: "A93-701; Kaupulehu Developments; A00-730, Lanihau Properties; A03-744, Hiluhilu; A06-770, The Shopoff Group, L.P.; A06-767, Waikaloa Mauka, LLC; and A10-788, HHFDC Forest City".

In a memorandum in support of its motion, the LUC argued that "[t]he additional 6 dockets designated by Appellant are not part of the evidentiary record in [this case]." DW opposed the motion to strike, arguing that the additional dockets demonstrated that the LUC violated DW's equal protection rights. DW also argued that the First Circuit Court had denied a substantially similar motion during Bridge's appeal to that court. Specifically, Bridge had requested that documents from eighteen LUC cases be included in the record on appeal in the First Circuit Court, and the First Circuit Court denied the LUC's motion to strike those documents. The Third Circuit Court denied the LUC's motion to strike.

Bridge made the following six main arguments in the circuit court: (1) the LUC violated HRS Chapters 205 and 91; (2) "zoning estoppel" prevented the LUC from enforcing the boundary amendment; (3) the LUC violated its equal protection rights; (4) the affordable housing condition was an "unconstitutional land

-35-

development condition"; (5) the LUC's final order was not supported by the record; and (6) the LUC violated its due process rights.

DW raised the following six arguments: (1) the LUC's final order violated HRS Chapter 205 and HAR Chapter 15-15; (2) the LUC exceeded its statutory authority in enforcing the affordable housing condition; (3) equitable estoppel barred the LUC from reverting the property to the agricultural land use district because DW's development rights in the property were vested; (4) its equal protection rights under the United States and Hawaiʻi Constitutions were violated; (5) its procedural and substantive due process rights were violated under the United States and Hawaiʻi Constitutions; and (6) the reversion amounted to an unlawful taking under the United States and Hawaiʻi Constitutions.

The LUC filed a consolidated answering brief, advancing seven arguments.[6] Those arguments were that: (1) HRS § 205-4's requirements relating to district boundary amendments do not apply to reversions; (2) the affordable housing condition was

---

[6] The County Planning Department also filed an answering brief. The County Planning Department explained that it relied on the LUC's reclassification of the land in adopting a rezoning ordinance, granting subdivision approval, and issuing building permits. The County Planning Department explained that the LUC's reclassification of the property back to the agricultural land use district "raises significant questions as to whether the [County's] rezoning action, pursuant to the January 8, 1993, Ordinance No. 93-1, amending the County's Zoning Code for the project area from Unplanned to Residential, Multi-Family, and Village Commercial uses, is still valid." The County Planning Department, however, did not suggest how the circuit court should decide the case.

constitutional; (3) Bridge's and DW's equal protection and due process arguments were unfounded; (4) the doctrine of zoning estoppel did not apply because the classification was made subject to conditions; (5) its procedures were proper; (6) its decision was supported by the record and was neither arbitrary nor capricious; and (7) there was no unconstitutional taking.

The circuit court entered its amended findings of fact, conclusions of law, and order reversing and vacating the LUC's final order on June 15, 2012. The circuit court did not address individual findings of fact and conclusions of law in its order. Instead, the circuit court's order provided that the LUC's April 25, 2011 order was "reversed and vacated in its entirety."

The circuit court first concluded that the LUC exceeded its statutory authority and violated HRS Chapter 205. The circuit court explained that HRS Chapter 205 "granted the LUC authority to establish land use regulations for the major classes of uses and to establish the boundaries of the districts for these uses," but that the "responsibility of enforcing the land use classification districts adopted by the LUC was expressly delegated to the counties." The circuit court further noted that HRS Chapter 205 "expressly delegates the power to enforce land use conditions, and zoning, to the counties." The circuit court therefore concluded that the LUC lacked "the authority to sanction Bridge and DW with reclassification of the Property to

-37-

the Agricultural land use district without consideration of the

factors required for land use district boundary changes pursuant

to HRS §§ 205-16[7] and 205-17[8]."

---

[7]     Section 205-16 provides: "No amendment to any land use district boundary nor any other action by the land use commission shall be adopted unless such amendment or other action conforms to the Hawaii state plan."  HRS § 205-16 (2001).

[8]     Section 205-17 provides:
In its review of any petition for reclassification of district boundaries pursuant to this chapter, the commission shall specifically consider the following:

(1) The extent to which the proposed reclassification conforms to the applicable goals, objectives, and policies of the Hawaii state plan and relates to the applicable priority guidelines of the Hawaii state plan and the adopted functional plans;

(2) The extent to which the proposed reclassification conforms to the applicable district standards;

(3) The impact of the proposed reclassification on the following areas of state concern:

        (A) Preservation or maintenance of important natural systems or habitats;

        (B) Maintenance of valued cultural, historical, or natural resources;

        (C) Maintenance of other natural resources relevant to Hawaii's economy, including agricultural resources;

        (D) Commitment of state funds and resources;

        (E) Provision for employment opportunities and economic development; and

        (F) Provision for housing opportunities for all income groups, particularly the low, low-moderate, and gap groups;

(4) The standards and criteria for the reclassification or rezoning of important agricultural lands in section 205-50;

(5) The county general plan and all community, development, or community development plans adopted pursuant to the county general plan, as they relate to the land that is the subject of the reclassification petition; and

(6) The representations and commitments made by the petitioner in securing a boundary change.

(continued...)

The circuit court expressly stated that it was not concluding that the LUC could never impose specific dates and benchmarks, only that "if the LUC is going to enforce these conditions, it must do so within a much broader context, and that context is found in HRS §§ 205-16 and -17."  In this regard, the circuit court noted that "one of the stated purposes of imposition of conditions under HRS Chapter 205 is to hold petitioners to their word of representations."

The circuit court next concluded that the LUC violated HRS § 205-4(h).  The circuit court explained that the LUC violated HRS § 205-4(h) by failing to "find upon the clear preponderance of the evidence that the proposed boundary is reasonable, not violative of HRS § 205-2 and part III of HRS Chapter 205, and consistent with the policies and criteria established pursuant to HRS §§ 205-16 and 205-17[,]" and "by failing to obtain six affirmative votes to amend the land use district boundary."

Third, the circuit court concluded that the LUC violated HRS § 205-16 because "there are no findings of fact or conclusions of law in the Final Order, nor any evidence in the record, indicating that the LUC considered the Hawaii State Plan."  The circuit court next concluded the LUC also violated

_____

[8](...continued)
HRS § 205-17 (Supp. 2008)

HRS § 205-17 because it failed to consider the factors listed therein. Fifth, the circuit court concluded that the LUC violated HRS § 205-4(g) because the OSC was not resolved within 365 days of its issuance.

The circuit court further concluded that the LUC violated HRS Chapters 91 and 205, and HAR Chapter 15 based on improper procedures. Specifically, the circuit court concluded that "instead of following these statutes and rules, the LUC implemented a rolling and continuing OSC procedure that not only extended far beyond the 365-day period required by HRS § 205-4(g), but also ignored the required procedures, and created new procedures that were not already established."

Sixth, the circuit court concluded that the LUC violated Bridge's and DW's procedural and substantive due process rights. The circuit court specifically noted "(1) [the LUC's] rolling and continuing OSC that extended far beyond the time period allowed by law; (2) the LUC's conduct that was in derogation of the statute and rules established to protect Bridge and DW; and (3) the LUC's attempt to create a new procedure that was not already established." The circuit court concluded that the LUC denied Bridge and DW their right to a meaningful opportunity to be heard, and that the final order was "arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare."

The circuit court also concluded that the LUC violated Bridge's and DW's equal protection rights.  The circuit court explained that the LUC treated "Bridge, DW and this Project differently, and less favorably, than other petitioners in cases involving facts and circumstances substantially similar to this case."  The circuit court noted "at least six other major project dockets" where the LUC has taken no action to revert, even though "the petitioners have failed to fulfill their representations to the LUC; have failed to meet their projected development timeframes; and have failed to build any housing units, much less any affordable housing units."[9]

The circuit court reversed and vacated the LUC's final order in its entirety, declaring that the April 25, 2011 order,

> violates constitutional and statutory provisions, exceeds
> the LUC's authority and jurisdiction, was made upon unlawful
> procedures, was affected by other errors of law, was clearly
> erroneous in view of the reliable, probative, and
> substantive evidence on the whole record, and was arbitrary,
> capricious, or characterized by abuse of discretion or
> clearly unwarranted exercise of discretion.

Finally, the circuit court ordered that the OSC and all other orders issued by the LUC that were inconsistent with the circuit court's decision were rescinded and voided.

The circuit court entered an amended final judgment, from which the LUC timely filed a notice of appeal.  The ICA

---

[9]     The circuit court did not reach the zoning estoppel and vested rights arguments advanced by Bridge and DW, and they are not at issue on appeal.  The circuit court also did not address DW's unconstitutional taking argument.  We therefore do not consider these arguments.

dismissed the appeal for lack of jurisdiction, however, because the amended final judgment neither entered judgment on nor dismissed the administrative appeals as to the State Office of Planning, the County Planning Department, and the County of Hawaiʻi. The circuit court thereafter entered a second amended final judgment, which stated that all claims against the County of Hawaiʻi, the County of Hawaiʻi Planning Department, and the State Office of Planning had been dismissed, and the LUC timely filed a notice of appeal.

The LUC timely filed an application for transfer of the appeal from the ICA to this court, and Bridge filed a joinder to the LUC's motion. This court granted the LUC's application for transfer.

On appeal, the LUC raises three points of error:

1. Haw. Rev. Stat. § 205-4(g) (2001) and Supreme Court case law specifically affirm [the issuance of] "an order to show cause why the property should not revert to its former classification or be changed to a more appropriate classification." The circuit court erred by ruling to the contrary[.]

. . . .

2. Haw. Rev. Stat. § 91-14(f) (2012) and Haw. Rev. Stat. § 91-9(e) (2012) provide that the court's review "shall be confined to the record." The circuit court erred by considering matters not part of the record.

. . . .

3. The circuit court erred in ruling in an agency appeal — without any opportunity for presentation of evidence and without regard to the right to trial by jury — that the LUC and individual commissioners violated developers' constitutional rights to equal protection and due process.

. . . .

-42-

## II.  Standard of Review

### A.  Secondary appeal

> Review of a decision made by the circuit court upon its review of an agency's decision is a secondary appeal.  The standard of review is one in which this court must determine whether the circuit court was right or wrong in its decision, applying the standards set forth in HRS § 91-14(g) . . . to the agency's decision.

Citizens Against Reckless Dev. v. Zoning Bd. of Appeals of City & Cnty. of Honolulu, 114 Hawaiʻi 184, 193, 159 P.3d 143, 193 (2007).

> Section 91-14(g) provides the following:
>
> Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
>
> (1) In violation of constitutional or statutory provisions; or
>
> (2) In excess of the statutory authority or jurisdiction of the agency; or
>
> (3) Made upon unlawful procedure; or
>
> (4) Affected by other error of law; or
>
> (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
>
> (6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

HRS § 91-14(g).

"'[U]nder HRS § 91-14(g), conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects under subsection (3); findings of fact under subsection (5); and an agency's exercise of discretion

under subsection (6).'" Citizens Against Reckless Dev., 114
Hawaiʻi at 193, 159 P.3d at 152 (quoting In re Hawaiian Elec.
Co., 81 Hawaiʻi 459, 465, 918 P.2d 561, 567 (1996)) (brackets in
original).

### III.  Discussion

**A.  The circuit court correctly concluded that the LUC erred in reverting the property to the agricultural land use district without complying with the requirements of HRS § 205-4**

The LUC argues that the circuit court's "fundamental
error was to equate the reclassification process [under HRS
§ 205-4(a)], with reversion pursuant to [HRS § 205-4(g)]."
Specifically, the LUC argues that pursuant to HRS § 205-4(g), it
is authorized to impose conditions on a petition seeking to amend
a district boundary, to issue an OSC, and to revert property to
its former land use classification.  In the LUC's view, because
reclassification is different than reversion, it was not required
to consider the factors set forth in HRS §§ 205-16 and 205-17, it
did not have to satisfy the requirements of HRS § 205-4(h), and
it did not have to satisfy the 365 day deadline set forth in HRS
§ 205-4(g).

DW and Bridge argue that the LUC may only revert
property pursuant to an OSC if the petitioner has not
substantially commenced use of the property.  DW and Bridge
further argue that, upon issuance of an OSC, the LUC must follow
the same procedures applied in considering any other district

-44-

boundary amendment petition.  Thus, according to DW and Bridge, pursuant to HRS § 205-4(h), the LUC must find by a clear preponderance of the evidence that the proposed boundary is reasonable, not violative of HRS § 205-2, and consistent with the policies and criteria established under HRS §§ 205-16 and 205-17. They also argue that at least six affirmative votes are required to revert property.

To the extent DW and Bridge argue that the LUC must comply with the general requirements of HRS § 205-4 anytime it seeks to revert property, they are mistaken.  The express language of HRS § 205-4(g) and its legislative history establish that the LUC may revert property without following those procedures, provided that the petitioner has not substantially commenced use of the property in accordance with its representations.  In such a situation, the original reclassification is simply voided.

Thus, once the LUC issues an OSC, the relevant considerations to be taken into account by the LUC and the procedures it must follow turn on whether the petitioner has substantially commenced use of the land in accordance with its representations.  When the LUC reverts property before the petitioner has substantially commenced use of the land, the LUC may do so without following the procedures otherwise applicable under HRS § 205-4.  However, if the LUC seeks to revert property

after use of the land has substantially commenced, then the LUC is bound by the requirements of HRS § 205-4. Applying these principles to the facts of this case, the circuit court correctly concluded that the LUC erred in reverting the property to agricultural use without complying with the requirements of HRS § 205-4 because, by the time the LUC reverted the property, DW and Bridge had substantially commenced use of the land in accordance with their representations.

### 1. Amendments to district boundaries pursuant to HRS § 205-4

There are four major land use districts in which all lands in the state are placed: urban, rural, agricultural, and conservation. HRS § 205-2. The LUC generally sets the standards for determining the boundaries of each district. Id.

Section 205-4 generally sets forth the procedures the LUC must follow in amending a district boundary. Section 205-4(a) provides that any department or agency of the State, any department or agency of the county in which the land is situated, or any person with a property interest in the land sought to be reclassified may petition the LUC for a boundary change. HRS § 205-4(a). Not less than sixty days and not more than one hundred eighty days after the proper filing of a petition, the LUC must conduct a hearing on the petition. HRS § 205-4(b).

Section 205-4(h) provides that no amendment to a

district boundary shall be approved unless the LUC "finds upon the clear preponderance of the evidence that the proposed boundary is reasonable, not violative of section 205-2 and consistent with the policies and criteria established pursuant to section 205-16 and 205-17." HRS § 205-4(h). Section 205-4(h) further provides that "[s]ix affirmative votes of the commission shall be necessary for any boundary amendment under this section." HRS § 205-4(h).

Section 205-4(g) is particularly relevant here. That section provides that within a period of not more than three hundred sixty-five days after the filing of a petition for a boundary amendment, the LUC shall act to approve, deny, or modify the petition, by filing findings of fact and conclusions of law. HRS § 205-4(g). This section further provides that the LUC may modify a petition by imposing conditions necessary to uphold the intent and spirit of HRS Chapter 205, the policies and criteria established pursuant to HRS § 205-17, or to assure substantial compliance with representations made by the petitioner in seeking a boundary change. HRS § 205-4(g). In other words, HRS § 205-4(g) gives the LUC broad authority to impose conditions on boundary amendment petitions. Lanai Co. v. Land Use Comm'n, 105 Hawaiʻi 296, 317, 97 P.3d 372, 393 (2004).

In general, however, enforcement of these conditions is

left to the counties under HRS § 205-12,[10] and not the LUC. Lanai Co., 105 Hawaiʻi at 394-95, 97 P.3d at 318-19. For example, in Lanai Co., the LUC reclassified land from the rural and agricultural land use districts to the urban land use district to allow for the construction of a golf course. 105 Hawaiʻi at 298, 97 P.3d at 374. The LUC reclassified the land subject to a condition prohibiting the landowner from utilizing potable water from the high-level groundwater aquifer for golf course irrigation use, and another condition requiring the landowner to develop its own sources of water to service the property. Id. at 300, 97 P.3d at 376. The reclassification was also made subject to the condition that the landowner "shall develop the property in substantial compliance with representations made to the [LUC]" and that "[f]ailure to do so may result in reclassification of the property to its former land use classification." Id. at 300-01, 97 P.3d at 376-77.

After the land was being used as a golf course, the LUC issued an OSC why the land should not revert to its former classifications or be changed to a more appropriate

---

[10] Section 205-12 provides:

The appropriate officer or agency charged with the administration of county zoning laws shall enforce within each county the use classification districts adopted by the land use commission and the restriction on use and the condition relating to agricultural districts under [HRS § 205-4.5] and shall report to the commission all violations.

HRS § 205-12 (2001).

classification, based on a claim that the landowner had impermissibly used water from the high-level groundwater aquifer, and had failed to develop and utilize alternative sources of water.  Id. at 302, 97 P.3d at 378.  The LUC concluded that the landowner failed to perform according to the groundwater aquifer condition, and issued an order requiring the landowner to comply with this condition, to cease and desist any use of water from the high-level aquifer, and to file a detailed plan specifying how it would comply with the order.  Id. at 306, 97 P.3d at 382. The circuit court concluded that the LUC's finding that the landowner had violated the groundwater aquifer condition was clearly erroneous and the LUC exceeded its authority in issuing the cease and desist order.  Id.

This court affirmed the circuit court's ruling that the LUC's finding regarding the alleged violation of the groundwater aquifer condition was clearly erroneous, but remanded the question of whether the landowner was using potable water from the high-level aquifer to the circuit court, with instructions to remand the issue to the LUC.  Id.  For purposes of remand, this court explained that whether there had been a breach of a condition was a determination to be made by the LUC. Id. at 317, 97 P.3d at 393.

This court explained that HRS § 205-4(g) empowers the LUC to use conditions to uphold the intent and spirit of HRS

Chapter 205, uphold the policies and criteria established pursuant the HRS § 205-17, and assure substantial compliance with representations made by a petitioner seeking a boundary change. Id. This court further explained, however, that HRS Chapter 205 does not expressly authorize the LUC to issue cease and desist orders. Id. at 318, 97 P.3d at 394. Thus, this court concluded, although "the LUC must necessarily be able to order that a condition it imposed be complied with, and that a violation of a condition cease," the "power to enforce the LUC's conditions and orders . . . lies with the various counties." Id.

This court explained that "[t]here is no provision in HRS § 205-12 that expressly delegates enforcement power to the LUC," and that "[i]f the legislature intended to grant the LUC enforcement powers, it could have expressly provided the LUC with such power." Id. Thus, this court observed, "looking to the express language of HRS § 205-12, it is clear and unambiguous that enforcement power resides with the appropriate officer or agency charged with the administration of county zoning laws, namely the counties, and not the LUC.[11] Id.

_____

[11] The Lanai Co. court also stated that "the legislature granted the LUC the authority to impose conditions and to down-zone land for the violation of such conditions[.]" 105 Hawaiʻi at 318, 97 P.3d at 394. As DW and Bridge observe, this passage was dictum. Moreover, elsewhere in the opinion, the court noted that the power to revoke was dependent on whether substantial commencement of use of the land had occurred. See Lanai Co., 105 Hawaiʻi at 317, 97 P.3d at 393 ("Moreover, 'absent substantial commencement of use of the land in accordance with such representations made . . . in seeking [the] boundary change[,]' the LUC is expressly authorized to order a reversion of land to the prior classification." (ellipsis and brackets in original)

(continued...)

The one exception to this general rule is found in HRS § 205-4(g). That section provides in relevant part that, "The commission may provide by condition that absent substantial commencement of use of the land in accordance with such representations [made to the LUC by the petitioner], the commission shall issue and serve upon the party bound by the condition an OSC why the property should not revert to its former land use classification or be changed to a more appropriate classification."[12]

This sentence was added to HRS § 205-4(g) in 1990. 1990 Haw. Sess. Laws Act 261 § 1 at 563-64. The legislative history indicates that the legislature sought to empower the LUC to <u>void</u> a district boundary amendment where the petitioner does not substantially commence use of the land in accordance with representations made to the LUC. In this regard, the Senate Committee on Energy and Natural Resources explained in its report that the purpose of adding this sentence was "to allow the Land Use Commission to attach a condition to a boundary amendment decision which would <u>void the boundary amendment when substantial commencement of the approved land use activity does not occur in</u>

---

[11](...continued)
(footnote and emphasis omitted)). Thus, this passage is not dispositive of the issue here.

[12] Although HRS § 205-4(g) provides that the LUC may either revert the land or change it to "a more appropriate classification," the latter alternative is not at issue in the instant case.

accordance with representations made by the petitioner." S.
Stand. Comm. Rep. No. 2116, in 1990 S. Journal, at 915 (emphasis
added). The House Committee on Planning, Energy, and
Environmental similarly stated in its report that the purpose of
the bill was to "strengthen existing statutes by permitting the
Land Use Commission further control over a proposed development
by voiding a change in zoning if the petitioner does not make a
substantial commencement of the approved land use activity." H.
Stand. Comm. Rep. No. 1086-90, in 1990 H. Journal, at 1265
(emphasis added).

        The legislative history further indicates that the
legislature added this language in order to empower the LUC to
address a particular situation, namely, where the landowner does
not develop the property in a timely manner. The Senate
Committee on Energy and Natural Resources specifically noted that
"[v]acant land with the appropriate state and county land use
designation is often subjected to undesirable private land
speculation and uncertain development schedules[,]" and that
"[s]uch speculation and untimely development inflates the value
of land, increases development costs, and frustrates, federal,
state, county, and private coordination of planning efforts,
adequate funding, public services, and facilities." S. Stand.
Comm. Rep. No. 2116, in 1990 S. Journal, at 915.

        The fact that the legislature sought to address

situations where the petitioner has not substantially commenced use of the land is further evidenced in the testimony presented to both the Senate and House committees.  In both the Senate and the House, the Office of State Planning offered testimony that "[a] positive approach to comprehensive land use planning and a strong preventive measure to land speculation, necessitates this bill <u>which will require that successful applicants for land use boundary amendments either 'use it, or lose it</u>.'"  Letter from Office of State Planning, to S. Comm. on Energy & Natural Res. (Feb. 7, 1990) (on file with the Hawaiʻi State Archives) (emphasis added); Letter from Office of State Planning, to H. Comm. on Planning, Energy & Envtl. Protection (Mar. 8, 1990) (on file with the Hawaiʻi State Archives) (emphasis added).  The LUC also offered testimony to both the Senate and the House, stating that "the proposed amendment will clarify the Commission's authority to impose a specific condition to downzone property <u>in the event that the Petitioner does not develop the property in a timely manner</u>."  Letter from Land Use Comm'n, to S. Comm. on Energy & Natural Res. (Feb. 7, 1990) (on file with the Hawaiʻi State Archives) (emphasis added); Letter from Land Use Comm'n, to H. Comm. on Planning, Energy & Envtl. Protection (Mar. 8, 1990) (on file with the Hawaiʻi State Archives) (emphasis added). Thus, the legislative history establishes that by adding this sentence to HRS § 205-4(g) in 1990, the legislature sought to

empower the LUC to void a boundary amendment, after giving the landowner the opportunity for a hearing, if the landowner failed to substantially commence use of the land in accordance with its representations.

The proper procedure to be followed by the LUC in ruling on the OSC therefore depends on whether the petitioner has substantially commenced use of the land in accordance with its representations. Section 205-4(g) represents a limited exception to the general principles set forth in HRS Chapter 205, which require consideration of whether the boundary change violates HRS § 205-2 (setting forth general considerations in districting and classifying land), is consistent with the policies and criteria set forth in HRS § 205-16 (compliance with the Hawai'i state plan) and HRS § 205-17 (setting forth decision-making criteria for the LUC).

Where the LUC issues an OSC and seeks to revert property based on a petitioner's failure to substantially commence use of the land in accordance with its representations, the LUC is not required to follow the procedures otherwise applicable to boundary changes under HRS Chapter 205. A reversion in such circumstances simply restores the status quo ante, prior to the original reclassification. Following the general procedures set forth in HRS § 205-4 would serve no

purpose under these circumstances.[13]

Indeed, as noted above, the legislative history of HRS § 205-4(g) indicates that the legislature intended to empower the LUC to <u>void</u> a boundary change where the petitioner failed to substantially commence use of the property in accordance with its representations.  S. Stand. Comm. Rep. No. 2116, in 1990 S. Journal, at 915 ("The purpose of this bill is to amend section 205-4(g), Hawaii Revised Statutes, to allow the Land Use Commission to attach a condition to a boundary amendment decision <u>which would void the boundary amendment</u> when substantial commencement of the approved land use activity does not occur in accordance with representations made by the petitioner." (Emphasis added)); H. Stand. Comm. Rep. No. 1086-90, in 1990 H. Journal, at 1265 ("The purpose of this bill is to strengthen existing statutes by permitting the Land Use Commission further control over a proposed development <u>by voiding a change in zoning if the petitioner does not make substantial commencement of the approved land use activity</u>." (Emphasis added)).  In other words, the legislative history of HRS § 205-4(g) indicates that

_____

    [13]   DW and Bridge argue that the LUC violated HRS § 205-16.  Section 205-16 provides that "[n]o amendment to any land use district boundary amendment <u>nor any other action by the land use commission</u> shall be adopted unless such amendment or other action conforms to the Hawaii state plan."  HRS § 205-16 (emphasis added).  However, as noted above, the legislature expressly granted the LUC the authority to revert land where the petitioner has not substantially commenced use of the property in accordance with its representations under HRS § 205-4(g).  There is no indication that the LUC's authority to void a boundary amendment pursuant to HRS § 205-4(g) is conditioned on a finding under HRS § 205-16.

compliance with all of the procedures of HRS § 205-4 is unnecessary when the petitioner has not substantially commenced use of the land because the prior reclassification is simply voided.  Thus, when the petitioner has not substantially commenced use of the land, the LUC may revert the land without following the procedures set forth in HRS § 205-4.[14]

On the other hand, if the LUC seeks to revert land after the petitioner has substantially commenced use of the land, the LUC is required to follow the procedures set forth in HRS § 205-4.  After the petitioner substantially commences use of the land, the circumstances have changed and it may no longer be appropriate to revert the land to its prior classification.

Having the LUC follow the procedures set forth in HRS § 205-4 after the petitioner has substantially commenced use of the land is also consistent with the division of authority between the LUC and the counties of Hawaiʻi.  As this court noted in Lanai Co., the power to enforce the LUC's conditions and orders generally lies with the various counties.  105 Hawaiʻi at 318, 97 P.3d at 394.  The one exception to this general rule, of course, is the LUC's express grant of authority to revert land if the petitioner has not substantially commenced use of the land in

_____

[14]     Of course, this is not to say that the LUC is free of any procedural constraints when it seeks to revert land in such circumstances. The LUC is bound by the procedures it has set forth in HAR § 15-15-93, including the specific requirements relating to the information to be included in the order to show cause, the necessity that a hearing be held on the motion, and the LUC's post-hearing procedures.

accordance with its representations.  See HRS § 205-4(g).

Thus, where the petitioner has substantially commenced use of the land, the LUC is required to follow the procedures set forth in HRS § 205-4 that are generally applicable when boundaries are changed.  The LUC is therefore required to find by a clear preponderance of the evidence that the reclassification is reasonable, not violative of HRS § 205-2, and consistent with the policies of HRS §§ 205-16 and 205-17.  HRS § 205-4(h).  The LUC is also required to obtain six votes in favor of the reclassification.  HRS § 205-4(h).  Finally, the LUC must resolve the reversion or reclassification issue within three hundred sixty-five days.  HRS § 205-4(g).  On the other hand, if the petitioner has not substantially commenced use of the property, then the LUC may revert the property without following the strictures of HRS § 205-4, so long as it otherwise complies with HAR § 15-15-93.

**2.  The LUC erred in reverting the property to the agricultural land use district without complying with the requirements of HRS § 205-4 because Bridge and DW substantially commenced use of the property**

We therefore consider as a threshold matter whether Bridge and DW substantially commenced use of the land in accordance with their representations.  If Bridge and DW did not substantially commence use of the property, then the LUC was not required to follow the procedures of HRS § 205-4.  If, however,

Bridge and DW did substantially commence use of the property in accordance with their representations, then the LUC was required to follow the procedures of that section.

Section 205-4(g) does not include a definition of "substantial commencement," and the LUC's April 25, 2011 order does not explain how the LUC interpreted that term. The interpretation of a statute is a question of law which is freely reviewable by this court. See Univ. of Haw. v. Befitel, 105 Hawaiʻi 485, 488, 100 P.3d 55, 58 (2004). "Substantial" is, according to Blacks's Law Dictionary, "considerable in amount or value; large in volume or number." Black's Law Dictionary 1656 (10th ed. 2014). In drafting HRS § 205-4(g), the legislature did not require that the use be substantially completed, but rather that it be substantially commenced. This is consistent with the concerns identified by the legislature in the legislative history of the statute, i.e., that it was trying to deter speculators who obtained favorable land-use rulings and then sat on the land for speculative purposes.

In its April 25, 2011 order, the LUC found that "Petitioners have not substantially commenced use of the Petition Area in conformance with the representations made in 2005 or in conformance with the applicable representations and conditions as of January 20, 2011." The LUC contends that Bridge and DW did not challenge that finding and are accordingly bound by it. DW,

however, challenged this finding in the circuit court,[15] and the circuit court reversed and vacated the April 25, 2011 order in its entirety.

To the extent the circuit court concluded that the LUC's finding as to whether DW and Bridge had substantially commenced use of the land in accordance with their representations was clearly erroneous, that conclusion was correct.  As the circuit court found, after the LUC rescinded the OSC on September 24, 2009, DW "continued to actively proceed with preparation of plans and studies, including building plans and studies for the EIS."  Moreover, "DW also continued work on infrastructure and proceeded forward with building the affordable housing townhomes for the Project."

Specifically, DW had constructed sixteen townhouses on the property by March 31, 2010.  DW explained that the units had "completed exteriors and interiors," with "cabinets and appliances installed," and with "electrical and plumbing . . . ready to hook up."  DW also offered testimony that an additional 24 townhouses had been constructed up to the roof, with 32 more townhouses in various stages of completion.  In a status report submitted to the LUC, DW also stated that mass grading for the

_____

[15]    In the circuit court, DW explicitly argued that the LUC finding "that 'Petitioners have not substantially commenced use of the [Property] in conformance with [their] representations,'" was "clearly erroneous in view of th reliable, probative, and substantial evidence on the record." (Brackets in original).

affordable housing sites had been completed, foundation slabs for eight buildings (64 townhouses) were complete, and the immediate access and internal roadways were graded.  In a later filing, DW also informed the LUC that by July 2010, "more than $20,000,000 had been expended for plans and construction work on the project."

Rather than holding the land undeveloped for speculative purposes — the result which the legislature sought to avoid in HRS § 205-4(g) — Bridge and DW invested a considerable amount of money and effort, by any reasonable measure, to develop the affordable housing.  In these circumstances, Bridge and DW substantially commenced use of the land.[16]  This is particularly clear when Bridge's and DW's actions in 2009 and later are viewed in the context of the events that occurred prior to the initial issuance (and subsequent conditional recision) of the December 9, 2008 OSC.

The 1991 order amending the original reclassification order included a condition providing that "Petitioner shall develop the Property in substantial compliance with the representations made to the Commission[,]" and that "[f]ailure to so develop the Property may result in reversion of the Property

---

[16]     In the absence of both a statutory definition of "substantial commencement" and an expression of LUC's interpretation of "substantial commencement" for a particular project, a determination of whether a party has substantially commenced use of the land will turn on the circumstances of each case, not on a dollar amount or percentage of work completed.

to its former classification, or change to a more appropriate classification."[17]  The LUC initially issued Bridge an OSC stating that it had reason to believe that Bridge and its "predecessors in interest have failed to perform according to the conditions imposed and to the representations and commitments made to the Commission in obtaining reclassification of the Subject Area and in obtaining amendments to conditions of reclassification."  The LUC did not err in issuing the OSC.  See HAR § 15-15-93(b) ("Whenever the commission shall have reason to believe that there has been a failure to perform according to the conditions imposed, or the representations or commitments made by the petitioner, the commission shall issue . . . an [OSC].").  Bridge and DW do not contend otherwise.

In this regard, during a January 9, 2009 hearing on the OSC, Commissioner Judge noted that despite the representations made by Bridge, "there are no affordable homes on that development.  Worse yet, there's not even a glimmer of them coming any time soon.  There's no building permits, there's no infrastructure."  Commissioner Kanuha expressed similar concerns, noting that "thus far there has been no progress, no nothing

---

[17]     Bridge argues that the affordable housing condition was an "unconstitutional land development condition."  However, as noted above, HRS § 205-4(g) gives the LUC broad authority to impose conditions, including those necessary "to assure substantial compliance with representations made by the petitioner."  Given this broad authority and Bridge's representations to the LUC, the affordable housing condition and its included deadline were valid.  Bridge cites no authority that would prevent the LUC from imposing benchmarks or deadlines on development schedules.

related to the Project." Commissioner Constrades later stated, "I don't see anything happen when I go by that place. You can tell me 'I spent millions of dollars.' Where? What has happened? Why four years ago when they're begging for housing and there's still nothing there? Now you guys come back and say 'Please, we need the housing.' Nothing's happening." Following a subsequent hearing on April 30, 2009, the LUC voted 7-0 to revert the property to its former agricultural land use district.

Despite the LUC's vote to revert the property, the Commission never entered a corresponding written order. Instead, the LUC later rescinded the OSC, provided that as a condition precedent, sixteen affordable units be completed by March 31, 2010. In this regard, DW notes that the "LUC did not define the term 'complete[.]'" This is correct. In its order, the LUC stated that the OSC was rescinded "provided that as a condition precedent, the Petitioner completes 16 affordable units by March 31, 2010," but the order did not make it clear what would qualify as a "complete" unit.

This court has observed that "[p]arties subject to an administrative decision must have fair warning of the conduct the government prohibits or requires, to ensure that the parties are entitled to fair notice in dealing with the government and it agencies." Lanai Co., 105 Hawaiʻi at 314, 97 P.3d at 390. Thus, "[a]n administrative agency, such as the LUC, has the

responsibility of stating with ascertainable certainty what is meant by the conditions it has imposed." Id. Here, the LUC failed to state what level of completion would satisfy the March 31, 2010 deadline.

Moreover, during the August 27, 2009 hearing, DW made it clear that the townhouse structures would be completed before utilities could be installed. In this regard, the following exchange occurred between DW's president and an attorney for the State Office of Planning:

> Q   Your current construction plan would have the vertical construction going on while the horizontal construction is continuing is that right?
>
> A   That's correct.
>
> Q   Would the vertical construction begin before the infrastructure connections to that pad or that pod is completed?
>
> A   Yes. It has to in order to meet the schedule.
>
> Q   So you build the house before you have a connection to the sewer, water, and electrical lines.
>
> A   That's correct.

Thus, DW made it clear to the LUC that vertical and horizontal construction would be occurring simultaneously, and that townhouses would be completed before they would have connections to sewer, water, and electrical lines. The LUC failed to state with "ascertainable certainty" that in addition to completing the physical townhouse structures, certificates of occupancy were also required in order to satisfy the March 31, 2010 deadline. See Lanai Co., 105 Hawaiʻi at 314, 97 P.3d at

-63-

390. Thus, to the extent the LUC kept the OSC pending because "[s]ixteen affordable units have been constructed, but no certificates of occupancy have been obtained," it erred in doing so.

In any event, regardless of whether the sixteen townhouses were "complete" by March 31, 2010, the record is plain that by the time the LUC held its July 1, 2010 hearing, DW had substantially commenced use of the property in accordance with its representations to the LUC. At that point, the LUC could no longer revert the property without following the requirements of HRS § 205-4.

In this regard, before the LUC could revert the property, its was required to find by a "clear preponderance of the evidence" that the reversion was reasonable, not violative of HRS § 205-2, and consistent with the policies and criteria established pursuant to HRS §§ 205-16 and 205-17. HRS § 205-4(h). The LUC was also required to resolve the OSC within 365 days. HRS § 205-4(g). These requirements were not met here.

In its order reverting the property to the agricultural land use district, the LUC explained how DW and Bridge had failed to comply with representations made to the commission. The LUC made no specific findings, however, relating to whether reversion was "reasonable," not violative of HRS § 205-2, and consistent with the policies and criteria established under HRS §§ 205-16

and 205-17. At most, the LUC concluded that "[u]nder the facts and circumstances of this case, reversion of the Petition Area to its original agricultural classification does not violate any applicable rule or statutory provisions, including Hawaiʻi Administrative Rules (HAR) subchapter 7 or Chapter 15-15, and HRS Chapters 91, 92, and 205." The LUC's conclusion, without more, fails to demonstrate that the commission considered the requisite factors under HRS § 205-4(h).

Moreover, the circuit court correctly concluded that the LUC violated HRS § 205-4(g) in failing to resolve the OSC within 365 days. The circuit court concluded that the OSC had to be resolved by December 9, 2009, i.e., 365 days after the initial OSC was issued on December 9, 2008. The LUC's findings of fact and conclusions of law were not filed until April 25, 2011. Although the LUC had rescinded the OSC on September 28, 2009, that recision was conditioned upon the completion of sixteen affordable housing units by March 31, 2010. On July 26, 2010, the LUC entered an order finding that the condition precedent was not satisfied, and that the OSC remained pending. Thus, the OSC was not resolved until April 25, 2011, well beyond the 365 days allowed under HRS § 205-4(g).

The circuit court therefore correctly concluded that the LUC erred in reverting the property without complying with the requirements of HRS § 205-4.

-65-

## B.    The circuit court erred in denying the LUC's motion to strike documents not in the administrative record

The LUC next argues that the circuit court erred in considering materials not part of the record.  Specifically, the LUC argues that the circuit court erred in denying its motion to strike from the record on appeal documents from other cases before the LUC.  DW argues that the circuit court did not err in allowing supplementation of the record with documents from other dockets before the LUC.  Because the additional documents were not part of the record before the LUC, they should have been stricken.

In an agency appeal, judicial review is generally confined to the administrative record.  See HRS § 91-14(f) ("The review shall be conducted by the appropriate court without a jury and shall be confined to the record, except that in the cases where a trial de novo . . . is provided by law and also in cases of alleged irregularities in procedure before the agency not shown in the record[.]" (Emphasis added)).  Section 91-14(e), however, provides in pertinent part that

> If, before the date set for hearing, application is made to the court for leave to present additional evidence material to the issue in the case, and it is shown to the satisfaction of the court that the additional evidence is material and that there were good reasons for failure to present it in the proceeding before the agency, the court may order that the additional evidence be taken before the agency upon such conditions as the court deems proper.

HRS § 91-14(e).

Here, neither DW nor Bridge moved to supplement the

-66-

record pursuant to HRS § 91-14(e). The circuit court was therefore "confined to the record" under HRS § 91-14(f). See Diamond v. Dobbin, 132 Hawaiʻi 9, 24, 319 P.3d 1017, 1033 (2014) ("Pursuant to HRS § 91-14(f), a review of an agency decision 'shall be conducted by the appropriate court . . . and shall be confined to the record.'").

Under HRS § 91-9(e), for purposes of agency decisions, the record includes: (1) all pleadings, motions, intermediate rulings; (2) evidence received or considered, including oral testimony, exhibits, and a statement of matters officially noticed; (3) offers of proof and ruling thereon; (4) proposed findings and exceptions; (5) report of officer who presided at the hearing; and (6) staff memoranda submitted to members of the agency in connection with their consideration of the case.

The LUC argues that the circuit court erred in denying its motion to strike portions of the record on appeal designated by DW and Bridge. Specifically, the LUC argues that the circuit court erred in allowing 9,917 pages of documents from the dockets of six other cases before the LUC to be included in the record. To the extent these specific documents were not before the LUC, the LUC is correct that the circuit court erred in denying its motion to strike.

On numerous occasions before the LUC, Bridge and DW argued that they were being treated differently than other

petitioners before the LUC. In support of this argument, DW and Bridge cited specific cases both in writing and during hearings. They did not, however, present documents from those other cases to the LUC to consider. Moreover, to the extent Commissioner Kanuha referred to the six cases during the April 21, 2011 hearing, neither DW nor Bridge presented the actual dockets to the LUC. Also, they did not move to supplement the record on appeal once the case was in the circuit court, and did not request that the circuit court take judicial notice of the dockets.[18]

Although the LUC argues that the circuit court erred in "considering" the additional materials designated by Bridge and DW, it is unclear whether the circuit court in fact relied on the documents in issuing its order. In the LUC's opening brief, it states that the circuit court "may have considered the material in its ultimate ruling but does not specifically refer to it." Thus, although the circuit court erred in denying the LUC's motion to strike, there is no indication that the circuit court in fact relied on the disputed documents.

_____

[18] Hawai'i Rules of Evidence (HRE) Rule 201(d) (1993) provides that a "court shall take judicial notice if requested by a party and supplied with the necessary information." Cf. Williams v. Aona, 121 Hawai'i 1, 11 n.6, 210 P.3d 501, 511 n.6 (2009) (court takes judicial notice of terms of collective bargaining agreement). However, there is no indication that DW requested that the circuit court take judicial notice of the documents from the other LUC cases, nor does the record demonstrate that the circuit court in fact did so. Additionally, DW and Bridge do not request that this court take judicial notice of the records.

**C.  The circuit court erred in concluding that the LUC violated DW's and Bridge's constitutional rights to due process and equal protection**

The LUC's final argument is that the circuit court erred in determining that the LUC violated DW's and Bridge's constitutional rights to due process and equal protection.  On the merits, the LUC argues that it violated neither DW's nor Bridge's substantive or procedural due process rights.  The LUC further argues that DW's and Bridge's equal protection arguments are unfounded.  Both DW and Bridge argue that the LUC violated their procedural and substantive due process rights, and equal protection rights.

This court has observed that, "'if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, . . . [this court] will decide only the latter.'" State v. Lo, 66 Haw. 653, 657, 675 P.2d 754, 757 (1983) (ellipsis and brackets in original) (quoting Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 347 (1936) (Brandeis, J., concurring)). Here, however, Bridge has a suit pending against the LUC and its Commissioners in federal court, raising many of the same issues presented in the instant appeal.  The federal district court stayed that case pending resolution of this appeal.  See Bridge Aina Leʻa, LLC v. Haw. Land Use Comm'n, No. 11-00414 SOM-BMK, 2012 WL 1109046, at *1 (D. Haw. Mar. 30, 2012).  The LUC filed an

appeal and Bridge a cross-appeal from the district court's order
(9th Cir. Nos. 12-15971 and 12-16076). The United States Court
of Appeals for the Ninth Circuit heard oral argument on the
cross-appeals on June 10, 2014, and thereafter issued an order
withdrawing submission of the appeal, pending our decision in
this case. In the interest of judicial economy, we therefore
also consider the constitutional claims decided by the circuit
court.

1. **The circuit court may decide constitutional issues in an administrative appeal**

As a preliminary matter, the LUC argues that the
circuit court erred in ruling on DW's and Bridge's due process
and equal protection arguments because the LUC had no opportunity
to present evidence and did not have the benefit of a trial by
jury. The LUC argues that it was "inappropriate" for the circuit
court to rule on these constitutional claims under such
circumstances, and that in doing so, the court "deprived the LUC
and Commissioners of any process whatsoever." Section 91-14(g)
explicitly provides, however, that the circuit court may reverse
or modify an agency decision "if the substantial rights of the
petitioners may have been prejudiced because the administrative
findings, conclusions, decisions, or orders are . . . in
violation of <u>constitutional or statutory provisions</u>[.]"
(Emphasis added). Section 91-14(g) does not condition the

circuit court's authority on either the opportunity of the parties to present evidence or whether the case was tried before a jury, and the LUC does not cite any authority supporting its argument that a court's power is limited in the absence of these conditions. Thus, the circuit court properly considered DW's and Bridge's constitutional arguments in reversing and vacating the LUC's final order.

2. **The circuit court erred in concluding DW's and Bridge's due process rights were violated**

The circuit court concluded that the LUC's conduct constituted "a denial of procedural and substantive due process" under both the United States and Hawaiʻi Constitutions. Specifically, the circuit court noted the LUC's "rolling and continuing [OSC] that extended far beyond the time period allowed by law," "conduct that was in derogation of the statute and rules established to protect Bridge and DW," and "attempt to create a new procedure that was not already established." The circuit court also concluded that the LUC "denied Bridge and DW their rights to a meaningful opportunity to be heard," and that its final order was "arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare."

"The basic elements of procedural due process of law require notice and an opportunity to be heard at a meaningful time and in a meaningful manner before governmental deprivation of a significant property interest." Sandy Beach Def. Fund v. City Council of City & Cnty. of Honolulu, 70 Haw. 361, 378, 773 P.2d 250, 261 (1989) (citing Matthews v. Eldridge, 424 U.S. 319, 333 (1976)).

Here, both Bridge and DW had notice and a meaningful opportunity to be heard before the LUC reverted the property. With respect to notice, as early as September 2008, Bridge was aware that the LUC was considering issuing an OSC. The LUC issued the written OSC on December 9, 2008. This was two months before DW had obtained any interest in the property. Both Bridge and DW therefore plainly had notice that the LUC might revert the property.

With respect to a meaningful opportunity to be heard, Bridge presented testimony on its behalf with respect to the OSC during hearings on January 9, 2009, and April 30, 2009. As noted above, after the LUC voted to revert the property, it did not issue a written order effecting the reversion. In fact, the LUC stayed entry of its decision and order, and allowed DW to present evidence during a hearing on June 5, 2009. DW also presented additional testimony during a hearing on August 27, 2009. After the March 31, 2010 deadline for the completion of the sixteen

units had passed, DW was again heard by the LUC during a hearing on July 1, 2010.  The LUC held subsequent hearings on November 18, 2010, January 20, 2011, March 10, 2011, April 8, 2011, April 21, 2011, and May 13, 2011.  Bridge and DW were each represented by counsel during all of these subsequent hearings.  Because both Bridge and DW had notice and a meaningful opportunity to be heard on the reversion issue, the circuit court erred in concluding that their procedural due process rights had been violated.

As this court has stated, "[d]ue process includes a substantive component that guards against arbitrary and capricious government action[.]"  In re Applications of Herrick, 82 Hawaiʻi 329, 349, 922 P.2d 942, 962 (1996).  To establish a violation of substantive due process, "an aggrieved person must prove that the government's action was clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare."  Lopez v. State, 133 Hawaiʻi 311, 322, 328 P.3d 320, 331 (2014) (quoting In re Herrick, 82 Hawaiʻi at 349, 922 P.2d at 962).

On this issue, the circuit court stated only that the LUC's final order "was by its terms arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare."  Although the circuit court echoed the language set forth by this court in Herrick, the facts of

this case do not support such a conclusion.

Here, the LUC first reclassified the land at issue from the agricultural to the urban land use district in 1989. By the time the LUC issued an OSC in December 2008, the land had changed hands numerous times and the LUC had amended the original reclassification order on multiple occasions. Moreover, as noted above, by the end of 2008, the landowners had done little to develop the property in accordance with representations made to the LUC. Given this history, the LUC was understandably wary of representations being made by Bridge and DW that they would be able to satisfy the 1991 order's conditions, as amended in 2005. Nevertheless, Bridge and DW repeatedly assured the LUC that they would be able to complete the affordable housing units by November 2010. As it turned out, however, Bridge and DW did not satisfy the affordable housing condition, and did not comply with numerous other representations made to the LUC. Thus, although Bridge and DW may disagree with the process that ultimately resulted in the reversion, the LUC's conduct was not "arbitrary and unreasonable," given the long history of unfulfilled promises made in connection with the development of this property. In these circumstances, the circuit court erred in concluding the LUC violated Bridge's and DW's substantive due process rights.

3. **The circuit court erred in concluding Bridge's and DW's equal protection rights were violated**

The circuit court also concluded that the LUC "intentionally treated Bridge, DW, and this Project differently, and less favorably, than other petitioners in cases involving facts and circumstances substantially similar to this case." Specifically, the circuit court concluded that the LUC treated Bridge and DW "in a materially, adversely different manner than other similarly situated developers, and that the LUC did so intentionally and without any rational basis for the differential treatment."

In general, the equal protection clauses of the United States and Hawaiʻi Constitutions "mandate[] that all persons similarly situated shall be treated alike, both in privileges conferred and in the liabilities imposed." State v. Freitas, 61 Haw. 262, 271, 602 P.2d 914, 922 (1979). "[E]qual protection jurisprudence has typically been concerned with governmental classifications that 'affect some groups of citizens differently than others.'" Engquist v. Oregon Dept. of Agric., 553 U.S. 591, 601 (2008). The United States Supreme Court has nevertheless recognized that an equal protection claim may be brought by a "class of one," "where the plaintiff alleges that [he/she] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference

-75-

in treatment." Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000).

Bridge and DW do not argue that they are part of a group of persons that are being treated differently than others. Rather, Bridge and DW argue that their equal protection rights were violated because the LUC did not seek to revert the classification of properties owned by similarly situated developers that experienced similar delays. Their equal protection arguments are therefore dependent on the "class of one" theory. This court has not previously adopted that theory. Assuming arguendo that the "class of one" theory is applicable under Hawaiʻi law, the LUC did not violate Bridge's and DW's equal protection rights.

DW argues that it was treated differently than others who were similarly situated, citing the affordable housing condition and its November 2010 deadline, and the fact that the LUC reverted the property because DW failed to meet this deadline. Neither DW nor Bridge, however, have demonstrated that they were treated differently than other similarly situated developers because the documents from the LUC cases involving the other developers were not properly included in the record on appeal, supra at 86-89. In any event, even assuming Bridge and DW had demonstrated different treatment, their equal protection argument still fails because they did not establish that the LUC

was without a rational basis.  As noted above, the LUC has broad discretion to attach conditions to orders granting reclassification petitions.  Lanai Co., 105 Hawaiʻi at 317, 97 P.3d at 393.  Given the long history of this property and the LUC's dealings with the landowners over the course of many years, we cannot say it was irrational for the LUC to exercise its broad discretion by imposing a completion deadline.  Again, the LUC had good reason to be wary of any assurances being offered by Bridge and DW, given the history of the project.

Moreover, the fact that the LUC enforced its conditions did not violate Bridge's and DW's equal protection rights.  As the Court has explained:

> There are some forms of state action, however, which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments. In such cases the rule that people should be "treated alike, under like circumstances and conditions" is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted.  In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise.

Engquist, 553 U.S. at 603.

In short, the LUC had broad authority to impose conditions and the power to determine whether Bridge and DW breached those conditions.  See Lanai Co., 105 Hawaiʻi at 317, 97 P.3d at 393 ("Whether there has been a breach of [a condition] is a determination to be made by the LUC.").  Thus, Bridge's and DW's equal protection rights were not violated because the record

-77-

does not establish that the LUC lacked a rational basis for its decisions.

## IV. Conclusion

The circuit court's second amended final judgment is therefore affirmed in part and vacated in part.  We affirm the judgment to the extent it is based on the circuit court's conclusion that the LUC erred in failing to comply with the requirements of HRS § 205-4, we vacate the judgment to the extent it is based on the circuit court's conclusion that the LUC violated Bridge's and DW's constitutional rights, and we remand to the circuit court for further proceedings consistent with this opinion.

William J. Wynhoff                    /s/ Mark E. Recktenwald
for petitioner
                                      /s/ Paula A. Nakayama
Bruce D. Voss and
Matthew C. Shannon                    /s/ Sabrina S. McKenna
for respondent
Bridge Aina Leʻa, LLC                 /s/ Richard W. Pollack

David J. Minkin,                      /s/ Randal K.O. Lee
Dayna H. Kamimura-Ching,
and Troy J.H. Andrade
for respondent DW Aina
Leʻa Development, LLC